CUT RATE DRUG CO. ET AL. *v.* SCOTT & GILBERT COMPANY

No. 2972

April 6, 1933.                                        20 P.(2d) 651.

*Green & Lunsford,* for Appellant:

*John S. Sinai,* for Respondents:

**OPINION**

By the Court, SANDERS, C. J.:

This is an appeal from a judgment rendered in favor of the respondent and against the appellant for the sum of $4,000 as compensatory damages for the breach of a five-party debtor-creditor agreement, wherein the respondent, Cut Rate Drug Company, Inc., plaintiff below, was the

first party, George F. Spaeth the second party, the appellant, Scott & Gilbert Company, Inc., the third party, John Wyeth & Bro., Inc., the fourth party, and J. K. Hornbein Company the fifth party. The case was tried in the court below before the Hon. Thomas F. Moran, as judge thereof, without a jury.

The record on appeal is over 600 pages long, supplemented by a voluminous judgment roll and extended written arguments. A statement of the facts out of which the appeal arises will serve to clarify the issues and to some extent will shorten the discussion of the evidence.

The Cut Rate Drug Company, Inc., in 1928 found its business in doubtful condition. Its president, George F. Spaeth, held a chattel mortgage upon its furniture and fixtures located in the company's place of business in the Cladianos Building at the corner of Second and Sierra Streets in the city of Reno, in the amount of $3,500. The company was indebted to Scott & Gilbert Company, Inc., in the sum of $8,452.75, and likewise indebted to John Wyeth & Bro., Inc., in the sum of $570.86, and likewise indebted to J. K. Hornbein Company in the sum of $2,446.01. It appears that attachments had been issued and levied to secure the claims of Scott & Gilbert Company, Inc., and John Wyeth & Bro., Inc. After a conference with its creditors named, the company on, to wit, July 18, 1928, entered into a written agreement with said creditors, which agreement was prefaced with the statement that whereas suits had been commenced and attachments issued on the claims of the third and fourth parties, and whereas it was deemed for the best advantage of the parties that said attachments be dismissed and arrangements be made for the economic and effective conduct of the business, it was mutually agreed, among other things, as follows:

"(1) That a Manager be designated by the third party to take charge of the business and affairs of said first party and conduct its drug store business with full power and authority to handle and conduct all bank accounts, to

purchase all goods and to employ such employees as is necessary to conduct said business; that such Manager shall not receive in excess of $60 per week, and subject to other arrangements between the parties, Charles F Weck shall be selected as such Manager. * * *

"(9) If during the life of this agreement, and for a period of six consecutive months, the business of the first party conducted in accordance with the terms of this agreement fails to show a profit of an average of $100 per month for said six months, then, and in that event, this agreement shall thereupon be terminated, and notice of such condition shall be given by the Manager to each of the parties to this agreement at least ten days before said agreement is terminated.

"(10) The Manager shall make a weekly report of the business and affairs of the first party to first, second, third, fourth and fifth parties hereto. * * *

"(12) It is the intention, understanding and belief of the parties hereto that by the means herein adopted, the aforementioned creditors may be paid in full within a reasonable time, but in the event that it does not so develop, then the life of this agreement shall not extend beyond eighteen months from the date hereof, and upon the termination thereof, at or before said time, all of the parties hereto shall be restored to their respective positions of debtors and creditors in accordance with the amount of money then owing by the first party to any of the creditors hereunder.

"(13) This agreement shall supersede all existing contracts or agreements between first and third parties hereto."

The agreement was carried out; the managing agent, Charles F. Weck, continuing the business as agreed without interruption, until January 18, 1930. In view of the trust character of the agreement, some question is raised as to the life of the agreement. The agreement is a law of the parties in this respect, as they expressly agreed that in no event should the life of the agreement extend beyond eighteen months after its date. The agreement was thus terminated on January 18, 1930. After that

date Charles F. Weck continued to carry on and conduct the business under the terms of the agreement with goods supplied and furnished him on consignment by Scott & Gilbert Company, Inc.

On August 29, 1930, the Cut Rate Drug Company, Inc., and George F. Spaeth filed a lengthy complaint in the court below, in which the plaintiff company prayed judgment against Scott & Gilbert Company, Inc., for $25,000 general damages and $25,000 special damages, and George F. Spaeth prayed judgment for $3,500 damages, all for the breach of the five-party debtor-creditor agreement hereinabove referred to. The plaintiff company, for cause of action, among other things, alleged that the defendant, after repeated requests and demands by the plaintiff, and in violation of the terms and provisions contained in said agreement, failed and refused to restore unto the plaintiff company its business, together with the stock of goods on hand and its leasehold interest in and to its place of business, as provided in said agreement, and wrongfully withheld from the plaintiffs the business and premises, claiming as the direct and immediate result of the breach complained of that the plaintiff company was prevented from consummating several proposals for sale of its business and was prevented from accepting the offers of several reliable parties to refinance the corporation so as to enable it to continue its business. In addition to denials, affirmative defenses were interposed by the defendant, and liability was contested. One defense was that on or about January 17, 1930, after several conferences with the plaintiff and its legal representative, it was understood and agreed that the defendant should continue to carry on and conduct the business under and pursuant to the terms of the original agreement until a sale thereof could be made, or until September 1, 1930. The defendant also cross - complained and demanded judgment for the accrued interest on goods, wares, and merchandise furnished the managing trustee during the continuance of the business.

The plaintiff, for reply, denied the affirmative defenses and the allegations of the cross-complaint or counterclaim, and in addition asserted that the defendant not having complied with the local corporation law, could not maintain its cross-action. Upon the trial the plaintiff, George F. Spaeth was eliminated from the case by the trial court's findings of fact. Therefore, the parties on this appeal will be referred to as convenience may suggest in the course of this opinion.

The important question in the case is whether or not the evidence is sufficient to sustain the judgment appealed from. The trial court's findings of fact follow closely the allegations of the complaint, which in substance are as follows: That on July 18, 1928, under and pursuant to the terms and conditions of the agreement above referred to, the Cut Rate Drug Company surrendered to Charles F. Weck, trustee or agent designated in said agreement, the possession of its drug business located at the corner of Second and Sierra Streets in the city of Reno; that under and by virtue of said agreement the business was to be restored to the plaintiff on January 18, 1930; that defendant held possession after that date and refused to restore it to plaintiff, with the result that plaintiff was damaged thereby; that as a direct result of defendant's failure and refusal to perform the agreement in respect to the restoration of the stock in trade and of the premises, plaintiff was damaged in the sum of $4,000.

In our opinion the first question presented for determination is whether the evidence is sufficient to sustain the affirmative defense interposed by the defendant respecting the continuance of the business under the terms of the agreement until a sale thereof could be made or until September 1, 1930. Most of the evidence in this regard centers around the testimony of John S. Sinai, attorney for the plaintiff company, that of George S. Green, attorney for Scott & Gilbert Company, Inc., and the testimony of L. J. Gilbert. The testimony of Mr. Sinai is in some respects supported

by the correspondence and telegrams which passed between the parties after January 18, 1930, and up to the commencement of this action. In his testimony Mr. Sinai declared, in positive terms, that there was never any such understanding or agreement as that alleged as a defense to the action, and that the business after January 18, 1930, was continued by the defendant without plaintiff's authority or consent. The testimony of George S. Green, as attorney for the defendant, and that of L. J. Gilbert, is positive in the opposite direction. Although claiming that the business was continued in violation of the original agreement, a careful perusal of the whole testimony unmistakably shows that after that date numerous conversations and much correspondence resulted from the presentation of three propositions, alternative in form, to John S. Sinai, as attorney for the plaintiff, by L. J. Gilbert, as the representative of the defendant, which propositions were as follows:

(1) That the Cut Rate Drug Company, Inc., pay to Scott & Gilbert Company $5,952.75 and take over the business.

(2) That the business of the company be listed for sale as a going business.

(3) That Scott & Gilbert be allowed to continue the business under the terms of the original agreement until September 1, 1930.

The facts in regard to these proposals were permeated throughout the record, and can only be gleaned with entire satisfaction from a perusal of the whole thereof. We shall not attempt to accumulate the testimony, for the reason that it is sufficient to say that the conclusions reached as to the facts by the trial court, upon conflicting testimony, are conclusive upon this court. This reduces the question for determination to that of whether or not the plaintiff, as the result of the breach, was damaged in any sum whatever.

The decision of the court below and its meager findings of fact do not enlighten us to the principle or

theory upon which the judgment for $4,000 as compensatory damages was arrived at. The learned counsel for the plaintiff contends and insists that the damages were measured by the loss of profits resulting from the failure and refusal of the defendant to restore unto the plaintiff the business and premises, as provided in the agreement of the parties. It is argued that loss of profits resulting from the breach of a contract, when ascertainable with reasonable certainty, is a recoverable element of damages for the breach complained of. In our opinion, the rule invoked by counsel is not applicable to this case. The agreement itself refutes the contention as to the ability of the plaintiff company to carry on its business, however large its income may have been at the time of the execution of the agreement. The agreement is an admission that the plaintiff was either in failing circumstances or that it was confronted with a forced sale of its property by reason of the attachments levied against it, which brought about the necessity for some arrangement being made for the protection of the parties. The agreement is an admission that in view of the financial straits of the debtor, its creditors took the chance of continuing the business under the arrangements made, which had no relation whatever to the net income of the plaintiff company. Therefore, if there were legal liability for the breach complained of, it depended on the course of future events. In this situation, the amount of the compensatory damages, if any, was wholly unpredictable. Furthermore, it is not shown, and it cannot be presumed, that at the time of the breach complained of the company was in any better position than it was at the time it surrendered possession of the business and premises to the managing trustee to escape enforced liquidation. Judging by these facts, we are clearly of the opinion that the rule of loss of profits as a recoverable element of damages for the breach of the contract has no application to the case. In other words, under the facts and circumstances disclosed by this

record, the net income of the plaintiff corporation, however large it may have been, vanished upon the execution of the agreement made and entered into for the declared and avowed purpose of salvaging the company from enforced liquidation.

It is argued on the part of the plaintiff that a breach of contract always creates a right of action. This is true, but where a right of action for a breach exists, and no harm was caused by the breach, judgment will be given for nominal damages only. Page v. Walser, 46 Nev. 390, 213 P. 107; Truckee Lodge No. 14, I. O. O. F. v. Wood, 14 Nev. 293; 1 Amer. Law Institute, Restatement of the Law — Contracts, sec. 328. Such is the case at bar. In our opinion, there are two facts shown by the entire testimony of both parties, and concerning which, at the trial, there was no dispute, which are fatal to the plaintiff's claim for compensatory damages. One is that on the date of the termination of the agreement, to wit, on January 18, 1930, the aggregate amount of the indebtedness of the contracting creditors of $11,469.62 was reduced, from the receipts of the business under the management and control of the trustee, to the sum of $5,952.75, which sum represented the balance due and owing the defendant upon its original claim of $8,452.75, which the plaintiff could not pay. The other fact shown by the testimony to be true is that after January 18, 1930, the business was continued by the managing agent or trustee by goods furnished on consignment of Scott & Gilbert Company, Inc., until August 31, 1930, two days after this action was begun. On that date the plaintiff was indebted to the defendant in the sum of $867.34. In this situation, it is apparent that instead of being damaged or injured by the breach complained of, the plaintiff was actually benefited to the extent of having its business returned to it practically free from debt, with the cloud of bankruptcy which was hanging over it at the time the agreement was executed removed, and with an established trade.

After repeated examinations of the voluminous record, we conclude that the judgment should be reversed, and the cause remanded to the court below, with directions that judgment be entered in favor of the plaintiff for nominal damages only, in the sum of $1.

(Petition for rehearing pending.)