HARRY D. FARNOW, APPELLANT, *v.* LAS VEGAS AERIE No. 1213, FRATERNAL ORDER OF EAGLES, BY J. I. CRAVENS, A. A. BALLINGER, A. G. BLAD, TRUSTEES, RESPONDENT.

No. 3492

January 19, 1948.                    188 P. 2d 615.

*Leo A. McNamee,* of Las Vegas, for Appellant.

*Morse & Graves,* of Las Vegas, for Respondents.

## OPINION

By the Court, BADT, J.:

Unfortunately the court is divided in the determination of this appeal. Unfortunately also the learned

Chief Justice, after writing his opinion in the case, was prevented by illness from further participation in the discussions and conferences concerning the same, or from rewriting his opinion accordingly, so that his opinion as originally written becomes a dissenting opinion herein. Such opinion includes the written decision of the learned trial judge (which contains a brief statement of the facts) and likewise contains a statement of additional facts involved. Accordingly, in the interest of brevity, recourse will be had to the trial judge's opinion and to the dissenting opinion for many of these facts, though such method detract from the continuity and logical sequence of our treatment of the subject matter.

The parties will be referred to as they appeared in the court below. That court treated the three trustees of Las Vegas Aerie No. 1213, Fraternal Order of Eagles, as the plaintiffs in the case, although the Aerie itself is named as the plaintiff (by its said trustees), and we shall so refer to it. While the defendant's objections to the capacity of the plaintiff to sue are not without their serious aspect, we pass this point without further comment, as we find no serious prejudice to the defendant in this situation.

In filing its complaint seeking a restitution of the premises the plaintiff first predicated its cause of action entirely upon the fact that the defendant's 1941 lease had expired, that he had failed to give notice of his exercise of his option for a renewal or for an extended term in accordance with the terms of the original lease and that in accordance with the other terms of the lease his holding at the time of the commencement of the action was a month to month tenancy only. Plaintiff gave defendant a notice to quit based entirely upon the grounds mentioned, and later commenced its action based upon such notice and upon the facts therein stated. It made no mention of the 1945 lease. It is true that plaintiff further alleged that said 1941 lease had not

been approved by the Grand Lodge, but did not allege any invalidity or infirmity in the lease growing out of that fact, nor did it allege that the necessity for such approval, if any, had been communicated to the defendant. The defendant answered alleging that he had given due notice in writing by registered mail of his election to renew and the plaintiff replied, persisting in its denial. The purpose of such denial is not clear, as the plaintiff had in its files at all times the actual written notice, given by registered mail, received and receipted for in ample time as required by the 1941 lease—more than ninety days prior to its expiration. This was conclusively proved by the evidence, and the trial court so found.

The renewal provision in the 1941 lease was to the effect that the lessee have an option to hold and enjoy the said premises for an additional term of five years at a monthly rental to be agreed upon, and that in the absence of such agreement the rental be fixed by three arbitrators, one to be appointed by each of the parties and those two to appoint a third, provided that in the exercise of such option the lessee give three months' notice in writing of his exercise of such option. Defendant's answer, after alleging the exercise of his option and the giving of written notice thereof, alleged that this was followed by negotiations between the parties resulting in the new five-year lease of November 28, 1945. Plaintiff's reply admitted the execution of the new lease, but alleged that the same embraced the entire premises, which included not only the ground floor embraced in the 1941 lease but also the second floor comprising the plaintiff's lodge room; that plaintiff had not obtained the consent of the Grand Lodge to such lease and that the lease was subsequently disapproved, both by the Grand Lodge and by the local Aerie. Its original complaint had set up as an exhibit section 3 of Article 33 of the plaintiff's constitution or bylaws providing substantially as follows: "No real estate which

is owned or acquired by any subordinate aerie. * * * may be sold, exchanged, conveyed, mortgaged or encumbered, by deed of trust or otherwise, by such aerie unless the details * * * of * * * such sale, exchange, mortgage, encumbrance or conveyance" be first submitted to the Grand Officers, and failing such submission, "shall be invalid and ineffective for any purpose." (The entire section is quoted verbatim in the dissenting opinion.) The reply again refers to this, but does not charge the defendant with the knowledge of it prior to the execution of the 1945 lease, nor does either the complaint or the reply allege that it was agreed that the 1945 lease was executed subject to the approval of the Grand Lodge, or that it was to be ineffective without such approval.

The answer had alleged the continuous payment of rent up to the time of the filing of the complaint, and the reply denied this. The proof showed that the defendant had made continuous payment of rent and that although some of the later payments had been refused, the plaintiff continued to tender the rental under the 1945 lease every month as the same fell due under the terms of that instrument.

Plaintiff's theory throughout the trial was that in view of section 3 of Article 33 of its constitution and bylaws above referred to, the 1941 lease to defendant's predecessors, and which had been assigned to defendant with plaintiff's consent, was entirely void and of no effect, and that the same applied to the 1945 lease. However, as noted, its notice of termination of the 1941 lease was based upon the conditions of that lease. The notice specifically stated: "This notice is given pursuant to the provisions of paragraphs 15, 16, 17 and 18 of said lease." Paragraph 15 defined the rights of the lessor in the event of default. Paragraph 16 defined a holding over. Paragraph 17 negatived a waiver on the part of the lessor if it failed to reenter upon a breach. Paragraph 18 contained the provisions for renewal.

Nevertheless, the plaintiff insists before this court that the 1941 lease was a nullity by reason of the constitutional restriction, despite the fact that both parties operated under it for five years, and despite the fact that the plaintiff relied upon its terms and conditions and upon an alleged breach of such terms and conditions as the grounds upon which it sought to repossess the property.

■ Although we shall advert to this later, it should be remarked at this point that the trial judge definitely found that plaintiff was estopped from denying the validity of the 1941 lease. Plaintiff has not appealed from such part of the trial court's decision (which appears in the written decision and in the findings of fact and conclusions of law and elsewhere in the record), and the same is the law of this case.

At an early stage in the trial the following situation developed: The original lease of 1941 embraced only the ground floor of the premises, which was used as a drugstore. The renewal lease of 1945 embraced the entire premises, namely, the downstairs drugstore and the second floor embracing the lodge room and some office rooms. It was then insisted that though the trustees might have authority to execute a renewal lease of the downstairs premises, they had no authority to lease the lodge room without the approval of the Grand Officers. (It was suggested by one of plaintiff's witnesses that the lodge room could not be leased without the consent of two thirds of the members of the local Aerie, but no attempt was made to prove any such rule or regulation.) Reliance upon the assertion that the lodge room could not be leased without the consent of the Grand Officers was in turn based entirely on the said section 3 of Article 33. Yet there is a total absence in that section of any distinction between the authority of the trustees to rent the lodge room and their authority to rent any other property belonging to the Lodge.

■ As a matter of fact it is extremely doubtful that

the provisions of section 3 of Article 33 apply at all to a lease of any of the local Aerie's property of whatsoever kind or nature—unless possibly such lease conformed to all intents and purposes with a sale or mortgage of the premises. During the course of the oral argument counsel were questioned as to this situation, and it was stated that it was considered that under section 1546 N.C.L. a lease was defined to be a conveyance. Such section provides: "The term 'conveyance,' as used in this act, shall be construed to embrace every instrument in writing, except a last will and testament, whatever may be its form, and by whatever name it may be known in law, by which any estate or interest in lands is created, aliened, assigned or surrendered." Section 3 of Article 33, as noted, provides that no real estate owned by the Aerie may be *sold, exchanged, conveyed, mortgaged,* or *encumbered* without approval of the Grand Aerie, and that action without such approval shall be invalid and ineffective. That our statute quoted above should be used as the sole method of the construction of the Grand Lodge provision appears to be entirely unwarranted. Indeed a reading of the Grand Lodge section indicates that its prohibition ran against a sale or mortgage of property. The parties to the instrument themselves, as well as the Grand Lodge itself, seem to have placed such construction on the matter for many years. Prior to 1941 the drugstore premises had been leased to other parties. The upstairs office space had been leased to lawyers and dentists and was still so leased at the trial of this action. The Grand Aerie had been receiving regular reports for years which showed the receipt of such rentals, yet no exception was ever taken and no objection ever made to such leasing of the local Aerie's property by its trustees. The trial court found that after September 1, 1943, and to November 28, 1945 (the period from the date of the assignment of the 1941 lease to defendant to the date of the execution of the new

lease), the plaintiff represented to defendant that plaintiff, through its trustees, had full power and authority to lease its said premises and that defendant relied upon their conduct, representations and statements and believed the same to be true and not otherwise, and took the assignment of the original lease and paid a valuable consideration therefor; and that it was not true that plaintiff informed defendant that the trustees had no authority to enter into any agreement disposing of the lodge hall on the second floor prior to the time the November 28, 1945, lease was signed by the parties; and that such original lease and option were valid, notwithstanding the lack of approval by the Grand Lodge. Such validity of the 1941 lease included the validity of the renewal covenant therein. In fact, when ruling on the motion for new trial, the learned trial judge confirmed his decision that both by ratification and estoppel the original lease was valid "and that that included the option (for renewal)."

Subject only to a determination as to whether the lease of November 28, 1945, was executed and delivered conditionally and subject to the performance of a condition precedent, namely, the obtaining of the approval of the Grand Lodge, virtually every element of estoppel held by the learned trial court to apply to the 1941 lease likewise applied to the 1945 lease. It remains, therefore, only to be determined whether an agreement to such condition precedent was agreed upon. As to this, the trial court made the following finding of fact: "That it is a fact that plaintiff and defendant entered into an agreement November 28, 1945, for the entire premises. That at the time said agreement was signed, it was agreed by the parties that said agreement must be approved by the Grand Lodge of said Fraternal Order of Eagles or said agreement would be a nullity." It also found, as a conclusion of law, the following: "That the new lease for the entire premises was signed subject

to the approval of the Grand Lodge and that this established a condition precedent to the effectiveness of the new lease for the entire premises which was never fulfilled."

■ We are unable to agree either with such finding of fact or such conclusion of law. Respondent insists that we are precluded from investigating this finding by reason of the rule, to which this court has consistently adhered for many years, to the effect that a finding will not be disturbed where there is substantial evidence to support it. We renew our adherence to such rule, but it does not apply in the instant case.

Defendant had occupied the ground floor since September 1, 1943, and through his predecessors had so occupied it since January 1, 1941. About September 12, 1945, some eighteen days prior to the date when appellant was required to give notice of his election to renew, he gave such notice in writing by registered mail. It will be remembered that such renewal was to be at a rental to be agreed upon by the parties or by arbitration if they failed to agree. By reason of the notice, a meeting was held to discuss this. Plaintiff's trustees then, for the first time, notified defendant that they were willing, in the renewal lease, to remove the restriction of the use of the premises involved (namely, the ground floor of the building) for drugstore purposes, and therefore expected a considerably higher rental. This grew out of the fact that plaintiff would probably not require the use of the second floor for its lodge room, as they were intending to build other quarters. Everyone agreed that this was a matter of great surprise to appellant, who naturally asked time to consider the matter.

A second meeting was held in which appellant then suggested that with the removal of the restriction he would expect to use the ground floor for a gambling casino, if he could get a license, and could use the entire building including the second floor. This in turn was a

surprise to the plaintiff's trustees, who desired to discuss that with their associates.

Thereafter a third meeting was held in which it was agreed that the appellant would rent the entire premises for $1,000 a month for the five-year term subject to his obtaining a gambling license; that otherwise $500 a month was all that a drugstore could pay for the ground floor. It was agreed that appellant's attorney, Mr. McNamee, would draw the lease and present it at a later meeting.

Accordingly, the fourth meeting was held, and appellant appeared with the prepared written lease and it was gone over by the parties. *Only one objectionable feature appeared in such written lease.* That was the provision that in the event a gambling license could not be obtained, then the $1,000 monthly rental should be reduced to $500. One of the trustees called attention to the fact that should this occur, then appellant would have not only the first floor premises but also the second floor premises at only $500 a month. This was apparently not the intention. This appeared to require a rewriting of the lease as drawn, but appellant assured them on his word of honor that if they would execute the lease as it stood and that if he could not get a gambling license, he would not want the second floor. With this understanding the lease was signed and delivered— each party keeping an original copy.

During this entire period of negotiations, up to the execution and delivery of the lease on November 28, 1945, the date of the last meeting, not a single mention had been made of the necessity for any approval thereof by the Grand Lodge. Appellant and his predecessor had been in possession for almost five years without any such approval and without any discussion of the necessity for such approval. If the plaintiff or any of its trustees or officers knew of such necessity, certainly they never advised appellant. It is true that the Lodge's secretary, an employee of the appellant, told him, *after the lease*

*had been executed and delivered,* that while the trustees could probably lease the downstairs or the store premises, they had no right to lease their lodge hall or the upstairs or second floor without a two thirds vote of the members—"that they could not lease the lodge room out—the boys' meeting room, without approval." As above noted, not only had appellant and his predecessor been in possession under a written lease for some five years but a predecessor of such predecessor had likewise leased the premises prior thereto and office space had been rented to attorneys and dentists, at least some of such tenancies being under written leases, and all without Grand Lodge approval.

Then appears the only item of testimony upon which could possibly be predicated the court's conclusion that the approval of the Grand Lodge was a condition precedent to the effectiveness of the executed and delivered lease.

One of the trustees testified that after he handed the signed lease to appellant he said, "If the Grand Lodge O.K.'s this lease, we will be O.K." This was testified to by Trustee Blad. The other trustees, Cravens and Ballinger, also testified that they heard it said. Farnow denies that any such remark was made to him in his hearing. Blad further testified that after he made this statement, Farnow said, "Well, gentlemen, if I don't get my gambling license I will have no use for the upper floor." Note this response to an assertion made for the first time after months of negotiation of a condition which could upset all of the negotiations and make a nullity of the lease which had just been signed and executed. It shows without a doubt that if the remark was made, the appellant did not hear it, or certainly did not understand its purport. His response was to reiterate the promise he had made that he would not need the upstairs if he did not get his gambling license. This is the situation as testified to by the plaintiff's trustees

themselves. It is reiterated again and again in the testimony. The trial court understood quite definitely, as remarked by him, that the lease had been delivered and each party had received his copy. The basis on which the court permitted the testimony and overruled objections was clearly stated by him. The court had been discussing the admissibility of parol evidence to show that there was a condition precedent upon whose performance depended the effectiveness of the contract. He then proceeded as follows:

"Now, upon that theory, I am satisfied with the ruling that was made; and proceeding upon that theory, allowing the plaintiffs to show, if they can, *that there was complete understanding between these parties* that this certain consent had to be had, had to be obtained, before this lease would become a binding lease upon the parties, notwithstanding that each party had received an executed copy, I think the authorities that are mentioned in this memorandum bears that out—*that is the theory I am going on* on that lease."

Later, when ruling upon a similar objection the court reiterated its understanding. The learned judge said: "* * * It all goes to plaintiff's theory that there was a condition precedent in the matter of this approval, *which condition was agreed upon.*"

And that *complete understanding between the parties* as to which the court felt it had to be satisfied, is held to have been established by a more or less casual remark made after months of negotiations and which the appellant very patently never even heard.

After the entire meeting between the defendant and trustees had been devoted to a discussion of the one questionable item, namely, the fact that defendant would not have the use of the upper floor if he did not get a gambling license and the discussion of a minor point as to payment of taxes and as to protecting the lessor against liens (which apparently took only a few

moments), here then is what occurred: The lease was signed by Trustee Cravens, it was signed by Trustee Ballinger and it was signed by the defendant Farnow, the lessee. Trustee Blad had been in and out of the room waiting on people. He came into the room and was the last to sign. Up to this point no mention of the Grand Lodge had been made at any time by any person. Trustee Blad signed and each party kept a copy of the lease. Then:

"Q. Will you state what happened then, Mr. Blad? A. Why, I made the statement—I says 'If—gentlemen, if the Grand Lodge O.K.'s this lease, we will be O.K.' Then Mr. Farnow again made the statement, he said 'Well, gentlemen, if I don't get my gambling license I will have no use for the upper floor.'

"Q. And when did you make that statement about the Grand Lodge, Mr. Blad? A. That said evening.

"Q. You mean by that, after the lease was signed? A. After the lease was signed. I believe I signed it and handed it over to Mr. Farnow."

Later Mr. Blad was again asked whether Mr. Farnow had anything to say after Mr. Blad said "If the Grand Lodge O.K.'s this lease, we will be O.K." Mr. Blad replied: "No, sir, there was no discussion whatever about it. That is all he said 'Gentlemen, if I don't get that gambling license I will have no use for the upper floor' * * * that was about all that transpired * * * we then adjourned."

This is repeated again and again. The other two trustees corroborated the testimony of Trustee Blad, using his identical words. In one or two instances there is a very slight variation, but the words testified to are almost identical.

Does this then supply the substantial evidence to sustain the finding that at the time the agreement was signed "it was agreed by the parties that said agreement must be approved by the Grand Lodge of said

Fraternal Order of Eagles, or that said agreement would be a nullity"? Does it measure up with the trial judge's ruling on the offer of evidence that the offered parol testimony was not objectionable as tending to vary the terms of the written contract, but was competent, relevant and material for the purpose of proving "that there was complete understanding between these parties, that this certain consent had to be had, had to be obtained, before this lease would become a binding lease upon the parties"?

■ We are compelled to answer these questions in the negative. We think the ruling of the learned trial judge in overruling of the objection to the question was correct. The learned trial judge did not attempt at the time to define the degree of proof that was required, nor do we find it necessary to do so. It is patent, however, that the minds of these parties never met in an understanding that this formal, carefully drawn, well considered, much discussed, executed and delivered lease was to be a nullity unless approved by the Grand Lodge. In passing we might note that the words used by Trustee Blad, even if Farnow indicated that he heard them, would not necessarily have had such effect. The plural salutation emphasizes this: *"If, gentlemen,* if the Grand Lodge O.K.'s this lease, *we will* be O.K."* This might well have referred to the relation of the trustees to the lodge membership in view of the disagreement among the members as to whether a lease should be executed and in view of the protest made by some of the members to the Grand Lodge, later discussed herein. Nor can we agree with the court's statement in the order denying a new trial with reference to the evidence concerning the necessity of obtaining Grand Lodge approval: "This subject was amply probed in the testimony." The probing brought forth the one statement of eleven words, which we have been unable to characterize other than as "casual," made by one of the parties,

without testimony or indication that it was heard by the other, and with every indication that it was not heard.

■ Plaintiff has submitted numerous authorities to support its contention that the acts of the trustees in executing the 1945 lease without the approval of the Grand Officers were ultra vires and void. Applied to the 1941 lease, the trial court found against plaintiff on this contention, found plaintiff estopped from asserting this defense. If plaintiff was thus estopped, such estoppel applied to the old lease as a whole, including the option for renewal, and the trial court so held. The continued operation under the old lease for five years only builds up the more strongly a like estoppel with regard to the new lease. Any attempted distinction between the leasing of the ground floor only and the leasing of the entire building including the lodge hall is unconvincing. If section 3 of Article 33 of the constitution of the Lodge applies at all, it applies to the ground floor as well as the lodge hall. If ultra vires applies to the lease of the lodge hall, it applies to the lease of the drugstore premises. We think the trial judge was clearly right in holding that plaintiff was estopped from denying its authority to execute the 1941 lease as against plaintiff's assertion that it was ultra vires and void. Plaintiff quotes excerpts from 38 Am.Jur., Mutual Benefit Societies, sec. 33, p. 467, to the effect that the rules applicable to corporate contracts generally which are ultra vires have been applied to mutual benefit societies. However, the same well-written article proceeds to recite many instances in which such societies have been held to be estopped from asserting a plea of ultra vires when the other party to the contract "has in good faith relied upon the assumption that it actually possessed the power which it pretended to have authority to exercise."

Respondent insists that an estoppel will not lie against its attack on its 1945 lease, because appellant "did not change his position to his detriment" by reason thereof,

and cites Farmers & Merchants Nat. Bank of Eureka v. Eureka Land & Stock Co., 56 Nev. 218, 49 P.2d 354, and other cases in support of this well-recognized rule. In that case the bank had simply taken (from officers it knew to be unauthorized) a corporate mortgage securing its hitherto unsecured notes. The bank had not changed its position to its detriment. On the contrary, its position had been improved, and this court properly held that the Eureka Land and Stock Company was not estopped from denying the authority of its resigned officers to execute the mortgage. Here, the defendant had obligated himself in writing to the payment of $30,000 (possibly $60,000) over a period of five years, an obligation which, under the experience of the 1941 lease, was enforceable to the letter. Other principles of the law of estoppel are discussed at great length by respondent and many authorities are cited, but we do not find them in point. As a matter of fact the claimed absence of Grand Lodge approval of the tenancy under the 1941 lease may well be debated, as the Financial Advisor of the Grand Lodge, under instructions of the Grand Worthy President, wrote the local officers on January 21, 1946, that he could not grant permission to lease "the lower floor of this building *other than as now rented.*" The only tenancy then in existence was that of appellant.

As we have indicated, we doubt that section 3 of Article 33 has any reference to a lease. It is patently aimed at sales and mortgages. Leasing and renting are simple terms used and understood by most laymen. The wording of said section 3 indicates that it was drawn by an attorney, who understood the legal as well as the usual significance of these words, and it would seem that if it was the intention of the framers of the constitution to prohibit leases of their premises by local Aeries, it would have been so provided. If we yield to the argument that it was the intention of the framers of this section that it be construed in accordance with

the Nevada statutory definition, we should then be faced with a situation whereunder the Grand Aerie in Kansas City, Mo., would be construing documents executed in each of the forty-eight states by subordinate lodges, in as many different ways. In the absence of any additional showing, no intention can be found in this section to police and supervise every transaction by the trustees of local Aeries in renting or leasing rooms, offices, storerooms or other premises. Although no such showing was made, we may even assume that the Grand Aerie exercises some supervisory power with respect to the maintaining of a lodge room essential to transacting the business of the local Aerie and the fostering of the friendly and fraternal relations of its members and the inculcation of the well-known high principles and ethics of the order, and that the Grand Aerie would probably refuse to charter a local Aerie in the first instance without provision for such meeting place. However, at the first meeting between the defendant and the trustees, held pursuant to defendant's notice of his election to renew his tenancy, the trustees notified him that they now desired to lease the entire building as they intended to build a new hall. The continued negotiations and conferences that followed this for over two months were all predicated on this idea. "I told him right from the start," testifies Trustee Cravens, "that we would no longer consider the drugstore as a small town drugstore * * * that we were not interested in whether it remained a drugstore or not, but we were going to build a new home * * *."

■ Appellant contends that it was error for the trial court to admit evidence of the assurances given by defendant that if he did not get a gambling license he would not use the upper floor. It is clear, however, that the trustees would not have executed the lease in its present form unless induced to do so by these assurances, most solemnly made. It would have resulted in

the grossest fraud and injustice to exclude this testimony, and the court properly admitted it. It is elementary that testimony of this kind, given under the circumstances testified to, and frankly admitted by the defendant, does not fall within the parol evidence rule. Respondent maintains that this being so, the judgment of restitution of the premises must then be affirmed for the reason that this court cannot write a new contract between the parties. We do not see this difficulty, however. If we approve the lease subject to the oral covenant which induced its execution, respondent is in no position to complain. It insisted throughout the trial, and continues to insist, and rightly so, that evidence of this inducing promise was properly admissible. But this evidence was offered, not to destroy the contract, but to establish the fact that such promise must be enforced.

■ Respondent relies upon the case of Collom v. Roos Bros., 25 Cal.App. 73, 142 P. 858, and cases of similar import, in support of its contention that the 1945 lease was not a renewal of the 1941 lease because a number of the terms of the 1941 lease were changed. The California Supreme Court, however, recognizes the general rule that the new lease may vary from the old one as to its terms and still be held to constitute a renewal. Many conditions in the Roos Bros. case (which held the second instrument to be a new lease and not a renewal) clearly distinguish it from the instant case. Respondent contends, and the learned trial judge held, that though appellant may have given his notice of exercise of his option, nevertheless after the conferences started, the parties were diverted from their original purpose of determining the rental for the extended term and eventually executed an entirely different contract for different premises, to be used for different purposes. The conclusion is, therefore, insisted upon that the parties reached no agreement on the rental for the

extended term, appointed no arbitrators to resolve this item, that the negotiations for the renewal therefore entirely failed and that, therefore, no extension of the term resulted. This web of rationalization is too finely spun. When defendant in good faith gave his notice of his exercise of his option to renew, the rental consideration was the only thing he came to discuss at the ensuing conference. The trustees demanded greatly increased rental *because they were willing to remove the use restriction,* thus permitting greatly increased revenues to the lessee through operation of the premises as a gambling casino. This in turn brought the suggestion from defendant that the premises include the second floor—one of the main features of this suggestion being that he could remove the stairway and thereby enlarge the front. The lease of November 28, 1945, resulted from the negotiations. The pivotal point of all negotiations was the rental. This could not be destroyed by the mere fact that the plaintiff offered additional consideration in support of its demand for increased rental.

We must again advert to respondent's insistence that the original lease of 1941 was void because of the restrictions contained in section 3 of Article 33 of its constitution. Following some sixty-five pages of citation of authorities and argument, respondent contends: "From the many authorities herein submitted, it is apparent that no lease was ever had between Crone, defendant's assignor, and the plaintiff." Again we point out that respondent took no exception to the findings or conclusions of the trial court, which court found that the 1941 lease, including its option for renewal, was a binding obligation of the parties and that respondent was estopped from questioning it. It would be difficult to see how the trial court could have found otherwise. The plaintiff's pleading insisted upon its right to repossess, because the term of that very 1941 lease had expired, because under the terms of that very lease, defendant's occupancy was under a month to month tenancy only,

and because defendant had failed to comply with the requirements of that very lease in the matter of his notice of exercise of his option to renew. Plaintiff in its verified complaint alleged that defendant's assignors "by virtue of said agreement and lease * * * went into immediate possession of said premises," that they assigned to defendant "with the consent and approval of plaintiff," and that thereafter defendant went into possession "pursuant to said lease and assignment."

In view of our conclusion that there is a total failure of proof to support the finding that the signed lease of November 28, 1945, was to be ineffective without the approval of the Grand Lodge, and that the facts support appellant's claim of estoppel, it becomes unnecessary to pass upon appellant's contention that much self-serving evidence was erroneously admitted by the trial judge over appellant's objection. This included the constitution and bylaws of the Grand Lodge governing subordinate lodges, minutes of proceedings of the local lodge, and letters, telegrams and interviews between members of the plaintiff lodge and officers of the Grand Lodge. All of these were without the presence or knowledge of the defendant. Whether or not such evidence was properly admissible, its most interesting significance is its indication that the first communication from the local lodge to the Grand Lodge in the premises was not a request by the trustees for an approval of the lease or for an opinion as to the authority of the local lodge, *but was a protest to the Grand Lodge by some of the members of the local Aerie.* Trustee Cravens testifies: "* * * as soon as some of the members of the lodge found that we had signed that kind of a lease—they were opposed to giving up the top floor anyway—and they sent in a wire to the Grand Lodge protesting it." The wire in question was dated December 10, 1945, twelve days after the lease was signed, and read: "Can trustees lease our lodge meeting hall without consent of members leaving aerie without meeting hall?" The reply was that if the trustees leased the

meeting hall "depriving aerie of same," the answer was definitely no, that there was apparently "some controversy over the matter, that full details must be forwarded, etc. The record does not disclose that the trustees ever did request the Grand Lodge to approve the Farnow lease. Farnow testified without objection and without contradiction that he told Cravens that the latter "should know that the agitation was being brought about by certain members who were very friendly with gambling interests there on the street." These circumstances all strengthened the plea of estoppel.

We have heretofore noted the entire absence from the plaintiff's pleadings of any allegation to the effect that plaintiff executed the 1945 lease subject to the Grand Lodge's approval or that such approval was necessary to its effectiveness or that the parties agreed that it was to be ineffective unless so approved. Appellant has consistently attacked this situation throughout the trial and the appeal to this court—by objections to testimony, motion for new trial, objections to the findings, specifications of error, and in the oral and written arguments. He insists that the finding of an agreement that the lease was to be a nullity unless approved by the Grand Lodge was outside the pleadings and that the judgment based on such findings is therefore without support. Hawkins, District Judge, speaking for this court in Bond v. Thruston, 60 Nev. 19, 98 P.2d 343, 346, 100 P.2d 74, said: "A comparison of the pleadings with the findings discloses that certain of the findings are on matters outside the issues made by the pleadings; such findings should be disregarded, and so much of the judgment as is based thereon held to be void, as against law. Marshall v. Golden Fleece Gold & Silver Min. Co., 16 Nev. 156; Scossa v. Church, 46 Nev. 254, 205 P. 518, 210 P. 563; Douglas Milling & Power Co. v. Rickey, 47 Nev. 148, 217 P. 590; Bowers v. Charleston Hill Nat. Mines, Inc., 50 Nev. 99, 104, 251 P. 721, 256 P. 1058." See, also, 17 C.J.S., Contracts, secs. 548, 549.

A reversal on this ground alone, however, would have required a new trial under amended pleadings, and we have for this reason emphasized the other elements above discussed.

From what we have said it is apparent that the judgment restoring the premises to the plaintiff and the order denying defendant's motion for a new trial must be reversed. It does not appear necessary to order a new trial, as we are satisfied that we must hold that the lease of November 28, 1945, is in full force and effect, subject to payment of accrued rentals, and subject to the oral modification of the lease, agreed to by both parties, to the effect that if appellant is not granted a gambling license, the demised premises include the ground floor only and do not include the second floor.

The judgment and the order denying appellant's motion for a new trial are hereby reversed, with costs, and the case is hereby remanded with instructions to enter judgment to the effect that appellant is rightfully in possession of the premises described in said lease of November 28, 1945, subject to the terms and conditions thereof, and subject further to the payment, without interest, of all of the accrued back rentals, and subject to the mutually agreed oral modification of said lease that if appellant is not granted a gambling license, after timely and bona fide application therefor, the demised premises embrace the ground floor only, and not the second floor.

HORSEY, J., concurs.

EATHER, C. J., (dissenting).

I dissent. For the following reasons I think the judgment and order should be affirmed:

This action was instituted by respondent for the restitution of a two-story building belonging to it in the business district of the City of Las Vegas, Clark County, Nevada, and to recover rental for the use and occupancy

of the ground floor by defendant, since January 1, 1946. Issues were joined and the case was tried on the merits in the court below, sitting without a jury. Judgment was entered in the court below awarding plaintiff restitution of its entire premises, including the ground floor, and awarding the plaintiff judgment for $500 per month rental for the use and occupancy of the ground floor by defendant, which sum the court below found to be the reasonable value of the use by defendant of the ground floor of the premises.

The complaint in the action is in the usual form in an action for forcible entry and detainer under the chapter of the Civil Practice Act relating thereto, the same being sections 9132–9152, N.C.L. 1929.

The appellant in his opening brief specifies twenty-two assignments of error; subdivision 1 of assignment of error No. 6 seeks to question the jurisdiction of this court and will therefore be determined first. It is as follows: "That there is no real person, natural or artificial, as party plaintiff in this action and that said action should be dismissed." Appellant tendered the same in the court below as his proposed additional conclusion of law No. 1, and the trial court refused to adopt the same. In support of said assignment and of appellant's proposed additional conclusion of law No. 1, he relies in his brief chiefly upon the decision of this court in the case of Proprietors of Mexican Mill v. Yellow Jacket Silver Min. Co., 4 Nev. 40, 97 Am.Dec. 510. I do not think the case is in point. The complaint in this case specifically alleges that the trustees named therein and in the caption are the duly constituted Board of Trustees of the Las Vegas Aerie No. 1213, Fraternal Order of Eagles, and that said trustees hold in trust the premises involved in this litigation. These allegations were adopted by the trial court as findings of fact Nos. 1 and 3. The evidence to support the said findings is uncontradicted in this record, and in addition thereto the trial court found as a fact in finding No. 19, which, it may be noted,

was proposed by appellant: "That plaintiff is an unincorporated, voluntary association formed for the purpose of uniting fraternally for mutual benefit, protection, improvement, and association generally, male members of the Caucasian race of sound body and health, of good moral character, who believe in a Supreme Being, and who are not less than eighteen nor more than fifty years of age."

This court held, in the case of Branson v. Industrial Workers of the World, 30 Nev. 270, 95 P. 354, that an action may be instituted by or against a voluntary or unincorporated organization, where the members comprising the same are numerous, by simply joining as defendants a few natural persons, members of the organization, sufficient to represent and protect the interests of the entire membership, and the few may be made plaintiffs or defendants for all.

I may also cite Liederkranz Singing Soc. of Lancaster v. Germania Turn Verein of Lancaster, 163 Pa. 265, 29 A. 918, 43 Am.St.Rep. 798. I am of the opinion that the complaint clearly shows with sufficient certainty the real capacity of the party plaintiff. Owens et al. v. Dudley, Mayor, et al., 162 Cal. 422, 122 P. 1087. Section 8634, N.C.L. 1929, expressly provides, among other things, that a plaintiff suing in a "representative" capacity need not state the facts constituting such capacity or relation, but may aver the same generally or as a legal conclusion. Moreover, I may note that in the purported lease set forth by the defendant in his answer, and under which he claims the right to the possession of the premises involved, the contracting parties are referred to in the following manner: "This lease, made and entered into this 28th day of November, 1945, by and between Las Vegas Aerie No. 1213, Fraternal Order of Eagles, acting by and through its duly constituted Board of Trustees, party of the first part, and Harry D. Farnow, hereinafter called the party of the second part." As I view the matter, the action was properly

instituted by the trustees for the use and benefit of the local Aerie.

The record in this case does not reveal that the point was raised in the court below in any manner other than by demurrer interposed by appellant, ground 2 of which alleges: "That the plaintiff does not have legal capacity to sue in that it does not appear that plaintiff is a natural or artificial entity." It was pointed out by this court in the case of Proprietors of Mexican Mill v. Yellow Jacket Silver Mining Company, supra; a demurrer for "defect of parties plaintiff" or "that plaintiff has not legal capacity to sue" will not reach the defect contended for by appellant.

Appellant states in his opening brief "the first four assignments of error come under the same heading and will be discussed together." I likewise so consider and dispose of same.

The question so presented involved chiefly the admissibility of the oral testimony of certain witnesses at the trial of this action, and whether or not the testimony so offered and received was within the scope of the pleadings. The written decision of the learned trial judge who admitted the testimony and who had the benefit of presiding at the trial and hearing the testimony at first hand, and then decided this case adversely to appellant, was incorporated in the bill of exceptions, and therefore we have the benefit of his reasoning and views expressed in said written decision and I believe it states the facts of this litigation clearly and succinctly and states the substance of appellant's first four assignments of error and decides the same adversely to appellant, and I think correctly so. I quote the written decision:

"This action is brought by Las Vegas Aerie No. 1213, Fraternal Order of Eagles, by its trustees, against Harry D. Farnow, for the restitution of its two-story building and for rentals. The plaintiff is a voluntary, unincorporated association. Of the status of such associations, it is stated in 38 Am.Jur., p. 448, section 7, that they are not partnerships for they do not hold themselves

out as such, their obligations standing on the ground of principal and agent.

"The plaintiff's complaint alleges that on January 7th, 1941, the ground floor of the premises was leased to one George M. Crone and Boulder Drug Company, a corporation, for a term of five years, and that Crone and the company, on or about September 1, 1943, with plaintiff's consent, assigned the lease to defendant; That paragraph 18 of the lease embodies an option to the lessees to hold and enjoy the premises for an additional term of five years, at a monthly rental to be agreed upon, upon the giving of notice of the exercise of such option; that the defendant has never given such notice, but held over under the terms of the lease; that on February 28th, 1946, plaintiff served defendant with notice of termination of the lease and demand for possession; that article 33, section 3, of the constitution for subordinate aeries of the Fraternal Order of Eagles requires that said lease be submitted to the Grand Worthy President of the order for his approval, and that it has never been so submitted. The defendant alleges that he gave due notice of the exercise of the option and that subsequently he and the plaintiff reached an agreement as to the monthly rental for such additional term as set forth in a new lease, dated November 28th, 1945, copy being attached to the Answer; and that he and his predecessors paid all rentals required by the original lease, and that he had paid or tendered all rentals required by the extension of said lease. Defendant also alleges an estoppel on the part of the plaintiff to deny the due execution of the original lease and the extension thereof.

"The plaintiff, in its pleadings, does not deny the authority of its trustees to negotiate for and execute on its behalf the original lease and the extension thereof, subject to the approval of the Grand Worthy President; but it contends that neither the original nor the extension ever became effective because neither has ever been approved by the Grand Worthy President, and that, in

the absence of such approval, the acts of the trustees in the execution of the lease and the extension are a nullity.

"The complaint, paragraph V, alleges that plaintiff demised and let the ground floor to Crone and the Drug Company, but alleges that the option was not exercised, and, further, that the lease was never approved by the Grand Worthy President. The defendant, in his Answer, Paragraph 3, alleges that the plaintiff and defendant 'reached an agreement as to the monthly rental for said additional term, all as set forth in that certain lease dated November 28, 1945, a copy of which is hereto attached, marked Exhibit 1, and made a part hereof.' In its reply, paragraph 11, the plaintiff alleges that 'plaintiff and defendant entered into an agreement, defendant's Exhibit 1,' and further that the Grand President has not approved the new lease. At the trial, plaintiff urged that there was a lack of authority on the part of the trustees to bind the local lodge, and that, especially as to the new lease, no such authority had been given, and that the local lodge has disapproved of the new lease. Upon the state of the pleadings as above described, no issue is presented as to the authority of the trustees to act for the local lodge in negotiating, signing and delivery of the new lease and extension, subject to the approval of the Grand Worthy Prresident.

"As to the validity of the original lease, the court doubts if the authority of the local lodge to execute the lease is affected by the terms of the constitution for subordinate lodges, where such terms are unknown to the lessee. But whether known or not, the court takes the view that, on the evidence, both estoppel and ratification apply to and confirm the validity of the original lease and option, notwithstanding the lack of approval. The court concludes that the original lease and option were valid.

"The plaintiff contends that there was no complete and unconditional delivery of the new lease to the defendant. Delivery usually consists of the physical

handing over of the document with the intent that it shall become immediately effective as to the rights therein set forth. 17 C.J.S., Contracts, sec. 64 (13 C.J., sec. 131) ; 26 C.J.S., Deeds, sec. 41 (18 C.J., sec. 95). Relative to the signing, Mr. Farnow testified (deposition, p. 15), 'So we proceeded to sign the document and then we shook hands.' Mr. Blad testified (deposition p. 8), 'Yes, the night we signed the lease I told him, 'now if the Grand Lodge O.K.'s this, it will be all right.' That was after we signed it, yes, sir.' Mr. Ballinger testified (deposition, p. 12), 'Well, when we signed the contract, Brother Blad spoke if the Grand Lodge O.K.'d the lease, it would be O.K.—That's all I know.' He testified at the trial that Blad's statement was made after the lease was signed. Mr. Craven testified (deposition, p. 22) that Mr. Blad said 'of course you understand that this will have to be O.K.'d by the Grand Lodge.' At the trial, he testified, in substance, that just as Blad started to hand him the lease, he spoke of the necessity of approval by the Grand Lodge. The proof shows that the delivery of the signed lease was substantially concurrent with Blad's statement relative to approval. This established a condition precedent to the effectiveness of the new lease. The proofs show that this condition has never been fulfilled. The court therefore concludes that the new lease is ineffectual either for the commencement of a new term of tenancy or as an agreement upon the amount of rental for an extension of the original lease on the ground floor, under the option. Defendant exercised his option by giving due notice thereof to the plaintiff. He met with the trustees for the purpose of negotiating as to the amount of rental for the extended term, but they were diverted from that subject and took up the negotiating of terms for the leasing of the entire building. No agreement was ever arrived at between them as to the amount of rental for the ground floor, the only part of the building covered by the option.

"If the option is still in force, does it give to the

defendant a present right of possession of the ground floor of the premises. Paragraph 9 of the original lease provides as follows:

"'9. As soon as said option is exercised, the said parties hereto shall, if they cannot agree upon the rental for said extended term within five (5) days after notice is given of the exercise of said option, immediately appoint said board of arbitrators, who shall agree upon and fix the rental for such extended term prior to the commencement of such extended term, or else said extended term shall operate.

" 'Time shall be of the essence of this agreement, and each and every part thereof.'

"The court can find nothing in the foregoing language, or in paragraph 18 of the lease, from which it can be inferred that the term of the lease is extended pending the settlement of the amount of rental under the terms of the option.

"The plaintiff is entitled to judgment for the restitution of the premises and for rental measured by the reasonable value of the use. From the proofs presented, the court takes the view that $500.00 per month is the reasonable value of the use of the ground floor of the premises. The plaintiff is entitled to judgment for rental at the rate of $500.00 per month for the period from January 1, 1946, to the date of judgment; and for costs of suit. Our Supreme Court has held that the law does not justify the awarding of treble rent. Regan v. King, 39 Nev. 216, 217, 156 P. 688."

I may also note from the record a portion of the testimony of the appellant at the trial of this case in the court below, in answer to questions by respondent's counsel:

"Q. Did you make a statement to them (trustees) at that meeting, that if you didn't get a gambling license that you wouldn't have any use for the second floor of the building? A. I did make such a remark. It was brought up by Mr. Cravens (one of the trustees) who

thought that the lease should read that if I didn't get my gambling license that I wouldn't be permitted to occupy the upper floor for the $500.00 figure.

"Q. Was this at the last meeting? A. I think it was either the last or the next to the last. It was one of the two, and I told them, 'Well, that could be put in there but it is going to necessitate having this rewritten,' and I said, 'I give you my word that I have no need for the upper floor if I don't get a gambling license.' Mr. Blad (one of the trustees) said, 'Well, your word is good enough for me.' Mr. Cravens said, 'Well, I suppose after all we have eight hundred members in our organization and if you break your word we will go ahead and boycott you,' and I said, 'I'll stay by my word'."

I believe it is clear from appellant's own testimony that the written instrument was subject to several conditions before it would become effective, and that further negotiations were necessary before there was a meeting of the minds as to just what particular portion of the premises was to be leased, and at what consideration.

I believe the rule to be well established that parol evidence is admissible, not necessarily to vary the terms of a written instrument, but to establish any condition precedent to the effectiveness of such written instrument, or to the same effect that there was a conditional delivery. Wigmore on Evidence, 3d Ed., vol. 10, at p. 7, subdivision 5, and authorities there cited. We also cite the decision of this court in Allenbach et al., v. Ridenour, et al., 51 Nev. 437, 279 P. 32; and Saunders v. Stewart, 7 Nev. 200.

There is substantial evidence in the record to support the decision of the trial court and to support the findings of fact and conclusions of law, and as this court has repeatedly held, findings of fact and conclusions of law based upon substantial evidence will not be disturbed upon appeal. Cut Rate Drug Co. v. Scott & Gilbert Co., 54 Nev. 407, 20 P.2d 651; Ward v. Scheeline Banking & Trust Co., 54 Nev. 442, 22 P.2d 358. I am therefore

satisfied that the various assignments of error asserting the lack of evidence to support the findings of fact and conclusions of law are not well taken.

The appellant contends in his motion for a new trial in the court below, and in various assignments of error in this court, that the respondent in its reply admits the execution of the renewal lease and that hence the trial court's conclusion of law that the new lease was signed subject to the approval of the Grand Lodge is contrary to said admission and outside the issues. It is alleged in the reply in response to defendant's answer that the plaintiff, respondent's trustees, informed the defendant, appellant, that they had no authority to enter into an agreement disposing of its Lodge Hall on the second floor of its building, without approval of the Grand Lodge, and the restrictive requirements of the bylaws were also pleaded, and also appear in the bill of particulars which was furnished to the appellant by respondent, and in which there is set forth the time and place of giving said information to the appellant. The oral testimony fully supports these allegations.

I take the same view as did the trial court that these pleadings on the part of respondent sufficiently apprised the appellant of respondent's contention that the second lease was void and ineffectual due to the lack of approval on the part of the Grand Lodge, and that appellant had been so informed by respondent in due time, and that the negotiations and actions of the Local Lodge so far as they pertain to the execution of the second lease, were subject to the approval of the Grand Lodge. It is conceded that the Grand Lodge refused to approve of the second lease in question and expressly instructed the Local Lodge to disapprove the same, which the Local Lodge did by vote of its members.

Appellant assigns as error No. 14 the introduction in evidence of respondent's Exhibit "C," being the constitution for subordinate aeries of 1944, and respondent's Exhibit "E" constitution for subordinate aeries of 1939.

The documents were identified by the secretary of the Local Aerie as having been sent him by the Grand Lodge for government of the Local Lodge, and the secretary testified that said constitution of 1944 was the constitution under which the Local Lodge conducted its affairs and was open for examination by any member of the Lodge or by other parties dealing with the Lodge. The only pertinent part of the document insofar as this case is concerned, is section 3 of Article 33 thereof which was pleaded in full by respondent in its complaint, and which section provides:

"Article 33.

"Section 3. Sale and Disposition of Real Estate.

"No real estate which is owned or acquired by any subordinate aerie, or by any person or body, in trust, constructive or otherwise, for the use of such aerie, may be sold, exchanged, conveyed, mortgaged or encumbered, by trust deed or otherwise, by such aerie unless the details of the subject matter thereof together with the pertinent, relevant and material facts warranting such sale, exchange, mortgage, encumbrance or conveyance of real estate shall first have been submitted in writing to the Grand Worthy President, for the purpose of securing the recommendation of the Board of Grand Trustees thereon and the written approval of the Grand Worthy President, and any action taken by any subordinate Aerie or the officers thereof, without first securing such approval shall be invalid and ineffective for any purpose. The proceeds of such sale, exchange, mortgage, encumbrance or conveyance shall be placed in the proper fund of the Aerie."

Sections 1545, 1546, N.C.L. 1929, provide that a leasehold estate is an interest in real property, and it was so held by this court in the case of Adams v. Smith, 19 Nev. 259, 272, 9 P. 337, 10 P. 353. I think the restrictive provisions in said section 3, article 33, were made known to the appellant by the trustees themselves, and

therefore conclude that there was in fact sufficient foundation laid insofar as the said section is concerned.

As I am satisfied that the trial court was correct in holding with the principles of estoppel and ratification, while applying to the original lease did not apply to the renewal lease, I am unable to concur with the majority opinion that the respondents were estopped from attacking the validity of the renewal lease. By reason of the constant adherence of this court to the rule that the findings of the trial court will not be disturbed where there is any substantial evidence to sustain the same, I am also unable to concur in the conclusion that no condition precedent was established with reference to the effectiveness of the renewal lease, nor do I find anything amounting to prejudicial error in any of the other assignments. I am therefore of the opinion that the judgment and order denying a new trial should be affirmed.

### ON PETITION FOR REHEARING

April 14, 1948.

By the Court, BADT, J.:

Good cause appearing therefor, it is hereby ordered that respondent's petition for rehearing be, and the same hereby is, denied.

HORSEY, J.: I concur.

EATHER, C. J.: I dissent.